Our final case this morning is No. 22-1946, PureCircle USA Inc. v. SweeGen, Inc., Mr. Joseph, I'm sorry, Mr. Panikowsky. Yes, Your Honor. Thank you, Your Honors. Stanley Panikowsky for the appellants, PureCircle. The District Court's judgment should be reversed because it erred as a matter of law on both written description and on Section 101. On written description, the Court improperly resolved disputed issues of material fact about the sufficiency of the patent's disclosure. Help me understand what's going on here. Yes, Your Honor. As I understand it, there are either four or five enzymes that have been identified that would achieve this conversion, correct? Correct, Your Honor. And you have said in several places in your brief that there are only about 1,800 possibilities, but I'm wondering whether that's really correct because as I read the record, 1,800 possibilities relate to a single enzyme, not to the four or five, correct? Correct, Your Honor. And then there is the possibility that in the future that additional enzymes would be identified which achieve the conversion and the claims would cover those new enzymes as well, right? Correct, Your Honor. So why isn't that a problem from a written description standpoint? If you wanted to limit your universe, the scope of the claim, to the four or five existing enzymes, you could have easily said that with the claim 14, which is limited to one of the enzymes, but you chose to write it broadly so that it covers enzymes that have not been discovered yet and may be discovered in the future. So that's a fairly broad claim and that in itself, it seems to me, creates a written description problem. Your Honor, there is no written description problem here and I will walk through those numbers to show why when you view this specification through the lens of a skilled artisan's knowledge and the prior art, as this Court instructed in Ariadne, it's sufficient disclosure for a reasonable jury to say, Sweden hasn't met their burden by clear and convincing evidence. So first, Your Honor, as you said, claim 14 is different here because it specifically identifies the UGT76G1 enzyme. And as Your Honor also said, the 1800 number does relate to that particular enzyme. And what is most important for the other claims about that 1800 number is to look at the methodology. But you drafted those claims to cover not only all the known enzymes, but any future enzymes as well, right? Yes, Your Honor, but there is no evidence in the record that skilled artisans have any reason to expect that there are going to be future unknown enzymes that lack the common structural features or the structure-function correlation that we see in the record here. What we know from... Well, what are the structural features that we're talking about? Common structural features? Yes, Your Honor, the common structural features are the specific folds and helices that are shown in the model of the UGT76G1 enzyme, for example, in the Olson article and also cited by PureCircle's expert. If I understand correctly, those structural features are peculiar to that one enzyme. They're not structural features that are necessarily shared with other enzymes that achieve the conversion. No, Your Honor, because there is evidence in the record, both from the 2005 Richmond article and the 2009 Keyshore patent application, both are cited in the patent and discussed extensively by Dr. Bollinger. What those references, known by a skilled artisan, show is that even though that very particular three-dimensional structure relates to UGT76G1, it was known in the art that all of the claimed UDP glucosal transferases had certain common structural features. Those are identified in that figure three from the Olson article that Dr. Bollinger cites. Where is the testimony that all the known enzymes had common structural features? Your Honor, that testimony is in Dr. Bollinger's rebuttal expert report at appendix pages 5568 and 5583. 5568? Yes, Your Honor. And 5583 was the other one? Yes, that was the endpoint, Your Honor. So it's 5568 through 5583? Yes, Your Honor. So where does he say this? So what we see here is that at 5569, he's talking about the Richmond article. Wait a moment. Yes, Your Honor. Is that in the appendix? Yes, Your Honor, it is. There's also another stretch where the same pages appear, but this is in the appendix. My appendix goes from 5559 to 6323. 5569? Now those pages seem to be missing from my appendix. Your Honor, if you have appendix page 6430, the same information is here because the parties submitted the same exhibit multiple times in connection with the summary judgment motions. So you can also find the exact same material starting at appendix page 6430. What's the best point? Maybe a sentence somewhere where Dr. Bollinger says... I don't have those pages in my appendix either. Those are in volume two, Your Honor. I'm in volume two. They're not there. I mean, it really is incumbent upon you to make sure that the documents that you submit to us are complete. Okay. Go ahead. On the structure, that the structure was known, what's your best... Where can we find that most efficiently? Yes, Your Honor. The pivotal sentence would be on 5570 or 6431 where Dr. Bollinger says, after talking about the Richmond article... Paragraph 286. Yes, paragraph 286. Okay. So after talking about the Richmond article which identified the 12 enzymes and then talked about the five functional ones because they all have this signature amino acid sequence, Dr. Bollinger says there may be others, but the number known in 2012 was small and they all had common structural features. Okay. Where is this at? 5570? 5570 and 6431. But he's not tying the common structural features to the active regions that do the conversion. I mean, if that's all he says, that's pretty vague. Your Honor, that is not all he says. That's the sentence... Where does he say that it has common structural features in the active regions? Correct. So following that, we look at page 5571, which is also at page 6432, and that's the rest of the range here, Your Honor, where he is showing this model and pointing out the particular active sites where you have your donor molecule docking. Where does he say that the active sites would be structurally identical? Your Honor, on page 5572, you have figure three there, and then he explains right below that that here we can see the RebM, which is also RebX in the claims, sitting in the pocket and can tell what amino acids in the active site make crucial interactions with the substrate. But that's not saying that other enzymes that perform the conversion have the same structure. Your Honor, he's not saying that, but here Swegion has the burden of proof by clear and convincing evidence, and we're on summary judgment. So I thought you'd suggested that there was testimony that there was common structural features that were relevant to conversion, and now it seems to me you're admitting that there is no testimony that there is common structural features. No, Your Honor. No what? No, Your Honor, I'm not admitting that there's no testimony. The testimony that we're looking at is that testimony. But it doesn't say that. Your Honor, it does say that because what Dr. Bollinger is doing, and again, it's not just Dr. Bollinger. It's pointing to the Richmond article, Keyshore, Swegion's experts, Dr. Olson's work, and what he's saying is these common structural features, we see where the UDP glucose donor molecule is sitting. We also see where the... Where does he say that those are common structural features? Your Honor, he says that these are common structural features in paragraph 286, and that's the beginning of his description of what these common structural features are. Is that the only place that he talks about common structural features? I'm sorry, Your Honor? 286, paragraph 286 is the only place that he talks about common structural features? No, Your Honor. That is essentially the topic paragraph for everything that follows here, and what follows is the description of the common structural features that are mentioned in an introductory way. Where in your brief did you argue that these enzymes that perform this conversion all have common structural features? Your Honor, we argue this throughout both our opening brief. Just give me a page where you argue that. Yes, Your Honor. So, Your Honor, starting with the reply brief. Where in the opening brief? I'll go back to the opening brief. So, Your Honor, starting at page 24, this is the section that contains that argument, and then on page 26, we show that Dr. Bollinger cited. Just show me the sentences. Yes, Your Honor. Page 26 of the opening brief. More specifically, Dr. Bollinger cited prior evidence showing that in 2012, a POSA would understand that UDP glucosal transferases had a common folded structure and have common amino acid active sites that must be conserved, i.e. not eliminated across mutant variants, to maintain the glucose transfer function of the claims. And it cites pages from the excerpt we were just discussing, and then the brief says that Dr. Bollinger identified prior art showing that these components must be physically held in a particular proper orientation to be able to complete the addition of the activated glucose unit. And then he goes on to discuss the evidence that the UDP glucosal transferases have an identifying signature amino acid sequence. And then there is the use of that three-dimensional model, which is also discussed further at pages 50 of the opening brief and forward, where you then see how this information known in the prior art was used to construct these three-dimensional models. And then the main issue here, especially with respect to Claim 14, is mutants. So what do we do with mutants? Well, this Court's decision in Adginomoto provides a blueprint for how you handle mutants. The way I read this, and maybe I'm reading it incorrectly, is that mutations of a particular enzyme would have common structural features, not that different enzymes have common structural features. Both are true, Your Honor. Can I ask you, it seems like the District Court's main concern was with the breadth of the claim construction that you agreed to, and that that's what opened up possibly trillions of embodiments that I think even you would have to agree there's not adequate written description for trillions of embodiments. So help me understand, is this claim construction, is it a definition from the specification, or is it just you made a mistake and agreed to a claim construction that for whatever reason there's not adequate written description? Your Honor, so the claim construction, which affects every claim except for Claim 14 of the 273 patent, that itself is not a purely functional definition because it comes from the specification. So it does come from the specification? Yes, but, Your Honor, with one change, where the specification said that a UDP-glucosyltransferase enzyme is a type of enzyme that then performs, can be any UDP-glucosyltransferase that performs a transfer function. The stipulated claim construction doesn't repeat the word UDP-glucosyltransferase in that definition. Rather, it says a type of enzyme that performs. And that's very broad. Yes, Your Honor, but it is not as broad as any enzyme, which is how it has now been interpreted by the district court in its original claims doctrine analysis as well as switching. You mean it's not any enzyme? It's any enzyme that performs the conversion, right? Your Honor, the stipulated claim construction uses the language a type of enzyme. And when you look at that in light of the specification passage from which it borrows, it's not trying to eliminate the notion of UDP-glucosyltransferase being a structural limitation on the class. However, Your Honor, even if one accepted that it could include any enzyme and that it's a purely functional definition, the district court's own opinion shows that's not the end of the analysis. It's the end on original claims doctrine. But it's the beginning of the analysis on the three tests that this court applied in Juneau. And what the evidence here shows is that just taking one of those three tests, the structure function correlation test, that there were tools known to one of skill in the art disclosed in prior art discussed in the patents acknowledged by Sweden's own experts, from which you are not left like a skilled artisan in Juneau to flounder not knowing how to distinguish which mutants would work and which wouldn't. You could use homology modeling to narrow it down and then routine automated assay testing to get your definite number of cases. But as I understand it, that homology modeling would not help you identify other enzymes, not mutations, but other enzymes beside the four or five that perform the conversion, correct? Correct, Your Honor. If there were other enzymes that lacked those structural features, here Sweden has the burden of proof. And Sweden did not identify in this record a single example of an enzyme that could perform the function that lacked those common structural features. And absent that evidence... So where are we? Suppose hypothetically, I know you disagree with this, but hypothetically that we think there is no evidence on your side of common structural features among different enzymes that perform the conversion function. Is then the district court correct that there's no written description support? No, Your Honor. Even if we had an absence of evidence, we know from the Supreme Court's decision in seal attacks that Sweden is the party bearing the burden of proof at trial and hereby clearing convincing evidence... But they have the burden of proof. But don't you have a burden of production to identify common structural features if they exist? Your Honor, we have that burden of production only if they meet their initial burden to show that they have evidence from which a reasonable jury could conclude. Yes, by clearing convincing evidence, there are no common structural features, no structure-function correlation, no representative species. And, Your Honor, this is operating under your hypothetical. As we've discussed today, there's ample evidence that PureCircle produce that shows that you can start with what's identified in the specification with these enzymes and these specific sequences for the genes that you've used to encode them to express these enzymes. Then you go to the prior arc cited in the patent to deal with mutants. And we can deal with mutants with homology modeling and then automated assay testing. And then you're not going to be in the Juno bucket where you simply have no way to distinguish between what's claimed and what's not. Instead, you're going to be in the Ajinomoto bucket where this Court acknowledged, yes, there is evidence of counterexamples here, that there's a record that says when you have mutations toward the consensus sequence, generally that increases promoter strength and vice versa. And, sure, the defendant pointed to articles that said, that's not always the case. We have deviations here toward the consensus sequence that have weaker function. And then we have deviations away from them that have stronger function. And this Court said... Is there anywhere in either the briefing or the appendix where you list out what you think are the genuine disputes of material fact that made it premature to grant summary judgment? Your Honor, there are portions in the appendix that do cite to the statement of undisputed and disputed material facts that were identified below. I think that the best source for that, Your Honor, would be in the reply brief, which is referring back to arguments made in the opening brief. What pages? Yes. So, Your Honor, if you look at the table of contents, under the argument section in Section 1, we laid out what we think the most important genuinely disputed facts are here. And it's the structure of UDP, glucosal transfers was known at the time of filing, correlation between structure and function, talking about fusions, mutants, et cetera. And then in Section 2, we take each of these disputes of fact and show why it is dispositive here under this Court's precedent. So 1A and B in your reply brief would be a good summary of where you think the genuine disputes of material fact are? Yes, Your Honor. And that those disputes of material fact at least align this case with aginomoto, where the Court acknowledged, just like Swede's evidence here, there is evidence going in the other direction that you're not going to have a one-to-one perfect correspondence between structure and function. But this Court said, we have never demanded that. And so we more modestly spoke in Ariad of a correlation, which means you can have counterexamples, you might not have perfect predictions from structure, but if you have the tools, like the tools in the prior art and that Dr. Bollinger tested here, that enable you to narrow the universe of relevant mutants and where a skilled artisan can readily determine what works, you've done enough to get to a jury. Wait a moment. I'm confused. Now you're talking about using homology modeling to identify common features, which is different from identifying common structure. It's a different argument, right? No, Your Honor. Homology modeling has two roles in this technology. So the first thing that homology modeling does is we take an enzyme, just like the Keyshore prior art did, or like Dr. Olson did, and you... So are you suggesting that the structure was not known but could have been determined by homology modeling? No, Your Honor. In 2012, even though the crystal structure of the UDP glucosal transferases wasn't known, the secondary structure, which is that three-dimensional model that we were talking about, you were able to determine that. So you're saying you don't need homology modeling because the common structure was known at the time. Correct. The homology modeling had already been done to produce the common structural features of the enzyme. And then the second way in which you use the homology model, Your Honor, is then you take that model, for example, of the UGT76G1 enzyme, and then you run it through the widely available computer software that then does modeling of potential mutants, where you change amino acids at various points, and then the computer program will tell you these are the mutations that can serve the structure that's needed to hold the right molecules in the right orientations. And that's how you get 1,800, Your Honor. But I'd like you to address briefly the 101 question, particularly in relation to claim 14, which does identify a specific enzyme. And so why is the district court wrong about claim 14 being 101 ineligible? Your Honor, the district court is wrong about claim 14 because of the conversion percentage limitation that is in claim 1. And that conversion percentage limitation, we know from the record, including admissions of Sweden's own experts, is not something that occurs in nature. Rather, as the examiner recognized in requiring PureCircle to add that limitation to overcome a section 101 rejection, in nature you don't get conversion percentages of at least about 50% or more. It happens only in the lab. But I guess the argument would be that 50% is just a gullible. There's nothing in the claims specification that tells you how to achieve the 50%, correct? Your Honor, there is no description in the claim of a process that distinguishes between getting the 50% and not. What the process is is to contact these substrates. And then there is ample guidance in the specification as to actually how you put that together. The reason, Your Honor, why this doesn't fall under this court's precedence, like American Axel talking about only a result, is here we have method of preparation claims, like in Illumina and CellsDirect. And what the court has said is we look at these claims and we see, are they directed to a natural phenomenon? And here, whatever arguments that Sweden wants to make, and that they've already made about Section 103, Section 112, about whether these result limitations help make the claim valid. In terms of eligibility, this court's precedence are dispositive because we know from the record you cannot achieve those conversion percentages in nature. What about Ariosa? Didn't we say something similar would not be patent eligible? No, Your Honor. Ariosa wouldn't be similar because that was not a method of preparation claim. When you have diagnostics claims, or perhaps claims that are drawn to something like a primer itself, this court has said that when the claim is directed to a natural law, the mere fact that you might be using some human-made tool to conduct that diagnosis doesn't automatically convert it into eligible subject matter. It would be one thing if you're creating a new measurement tool and you're claiming that. That could be eligible. But if all you're doing is taking conventional techniques, whether they're natural or human-made, and then applying them to observe the natural law, those claims are generally not eligible. But this court has said when we're in the method of treatment and method of preparation universe, we look at it differently. All this says, Claim 14, is a method that achieves a 50% conversion rate, right? Correct, Your Honor. It doesn't tell you how to do it. Other than what is described earlier in that method, which is that you take these substrates and then you contact them with each other. That part of it was known in nature, right? Yes, Your Honor, except once you introduce the conversion limitation, you know that you're in the lab, and this entire claim has to be performed by a human being. Because, again, we know from the record, pages 6609, from Dr. Bollinger's testimony, to experts who testified for suigium, we know that these rates don't occur in nature. And therefore, we're in a situation also like natural alternatives, where in natural alternatives, the court said, yes, these are all natural products that are being used in the claim, but we're treating a patient with unnatural amounts of the beta alanine. And those amounts of this product do not occur in nature, even though the product itself. This isn't a method of treatment, right? Correct, Your Honor, and that's why Illumina and CellsDirect are the most directly, factually on-point precedents, because they are talking about methods of preparation, distinguishing them from the diagnostic claims. And what the court said in Illumina is, here we have human-engineered parameters to create an improved product. We have the same thing here, Your Honor, where we have this human-engineered parameter of at least a 50% conversion rate that we can't achieve by growing plants and extracting RebEx from the plants. We can only achieve that by going to the lab. And that's what these inventors discovered, that then gave rise to this specific application, where you take these starting materials, some natural, they could be recombinant, you go to the lab, and you contact them, and you're able to create a hyper-production of RebEx. There's nothing here that tells you how to do that. Your Honor, the specification does give working examples for the specific types of materials and the specific proportions that you would use in the lab to create certain things, catalyze the reaction. And that's the role of the specification, to disclose and enable. It's not required that the claims spell out every technical step in that process to survive a Section 101 challenge. Rather, the fact that they're claiming non-naturally occurring conversion rates is enough to say this claims... But the claims are not limited to the examples, right? Correct, Your Honor, not limited to the examples. Okay. I think we're out of time. Unless my colleagues have any questions. Thank you, Your Honor. All right. Mr. Rosenthal. May it please the Court. I propose to start with the written-scription issue. And I would like to sort of point to what I think are the undisputed facts on what was and wasn't known about this class of enzymes in the prior art. And I think perhaps the clearest place, the clearest sort of tight summary of what was known is at Appendix Pages 7507-08, which is from Pure Circle's own statement of undisputed facts about what was known. And this is quoting, this is pointing to some of the same material that my friend pointed to at other portions of the appendix. This is sort of the summary of it. Hold on, hold on. 7507. Yeah, and I think 7508 is really sort of where we're up here. Oh. And so the point is that the 12 known or suspected. It takes a while to fish out the appendices. It is a multi-volume extravaganza. My apologies. It's not deficiency in your appendix. It's deficiency in my looking at the wrong appendix. Go ahead. So if we look at 7508, we get to the 12 known or suspected glucosal transferases. And those are found in the Richmond article. And the Richmond article itself is in the joint appendix starting at page 5972. And what Richmond did was to take a database of expressed sequence tags from the Stevia Robodiana Bertoni plant. So expressed sequence tags are little snippets of DNA that have been derived from messenger RNA that's encoding proteins in the plant. And so we know that these are bits of RNA, bits of DNA, that are associated with some sort of protein that can be found in the leaf. And what he did was he searched the database using what he said was a sequence that identifies UDP glycosal transferases, which is to say enzymes that can take a uridine diphosphate molecule with some sort of carbohydrate attached to it, not just glucose, and transfer it to something. Could be anything. Does not have to be a stevial glycoside. Does not have to be any sort of particular substrate. And so we have this immense category of enzymes, the so-called super family of UGT or glycosal transferases, which are just the collection of anything that can transfer any sugar or carbohydrate from UDP to anything else. And what about the testimony that he's relying on about common structure? Because, of course, for written description purposes, if there is common structure, even though we're talking about a large number of possible candidates, that's sufficient for written description purposes. And he's pointed us to some testimony, which he says that there's common structure. I guess it would have to be common structure in the active regions, and that that satisfies written description. That seems, in fact, to be the primary argument. Right. And our point, and I think the reason why that argument doesn't work, will be clearer if I sort of go through where I was heading before with Richmond and how we got to the 12 or the 5 enzymes. But the answer is there's no evidence of what that structure is. We can search in the specification. We can search in the prior part. We can search in the record of this case. And there won't be any statement of what it is. But Bollinger clearly says there is common structure in the right place, but doesn't tell us what it is. Correct. And he doesn't, right, he doesn't tell us. Because what we have, to sort of cut to the chase, is we have one class of enzymes, the UGT76G1 enzymes. And it's not just one enzyme. It's a whole family of enzymes that have been shown to be able to make REV-M. And the only specific example that we know of that actually makes REV-M is the one that is the wild-type found in Stevia rubidiana-Bertoni, and we have an amino acid sequence for that one. There is no other enzyme that has been shown to make REV-M. And so the question is, what is it about this enzyme that allows it to catalyze? What is it that other enzymes would have to have in order to be able to make this function? And there isn't any answer to that question. I'm a little confused. I thought that there was agreement that there were four, maybe five enzymes that made the conversion. No, Your Honor, and that's what I was trying to get to with my Richmond example. So if I could just pick up there. So what Richmond did was he took a sequence that has been identified as being associated with the part of these enzymes that grabs onto the uridine diphosphate molecule. And that is the so-called signature sequence for what they say is the signature sequence for glucosal transferases. In fact, it's the signature sequence for glycosal transferases, and it's the signature for what grabs the uridine molecule. It doesn't tell us anything about what substrate the enzyme works on. And this is all spelled out in the Joint Appendix. So what he does is he uses that, he sticks that into the database and says, okay, what in Stevia rebaudiana in this database of expressed sequence tags has this sequence that's a candidate even to be in this super family of enzymes? And he finds 12. And of the 12, seven of them don't do any transfers that they could find. And, in fact, he got 54 hits in the database. There was only a complete enzyme sequence for 12 of them. And when he tested them on various substrates, seven of them didn't do anything. Five of them were able to do some sort of glucose transfer, but only three of them were able to transfer two stevial glycoside substrates. And that is what is summarized here on page 7508. He says only five were shown to be functional, only three were capable of adding glucose units to stevial glycosides. And then he says later work showed that another enzyme also is able to at least transfer sugars to stevial glycosides. But none of these enzymes has been shown to be able to make RebM, except for the one that is described, the one working example that is described in the specification here. And so, you know, this gets you. So you say that. Where do we find in the record testimony that says that these other enzymes are not able to make RebM? Well, I think there's just the absence of any indication that any of them has been able to make RebM, except for the one that we're talking about. I mean, I don't know how you would prove the negative. You could have testimony that these other enzymes haven't been shown to make RebM. Well, I think I guess what we know about the other enzymes in the prior art. We've got to understand. We can be very articulate. We can be very knowledgeable. That's not the record. The record is what we have to deal with. What I want is something in the record that tells me that what you're saying is correct. Your Honor, I guess I don't think that that issue is actually in dispute. I don't think there's ever been a suggestion that any enzyme, other than the one example mentioned in the specification, can turn RebD into RebM. That's part of the reason why we have a breadth problem here. First of all, we don't even know for the five enzymes. There's nothing in the record that says that these other enzymes aren't capable of making RebD into RebM? Your Honor, all I can tell you is that there's no evidence of any of them doing it. Our point is that that's one reason why we have a problem knowing which enzymes are going to be in this genus and which ones are not, because it's up to the specification. If they're going to claim every possible enzyme that can make RebM, they have to either show some structural feature, some structure-function relationship that explains why it is that the enzyme can do this, or else they need to come up with a representative number of species, and they haven't even argued that their one example is a representative number of species. So we have just the one, and instead of saying, well, we're going to try to make a bunch more, see if we can find any more, and then try to get a representative number of species, they just say, well, we have the one, and with homology modeling, you could probably find some others. And it's up to you to sort of go out and find them. And I think under this Court's cases, that is not enough to support the written description requirement. In our procedural posture, it's up to you to show that no reasonable juror could review this record, taking it in the light most favorable to them, and reach any conclusion other than that you've proven by clear and convincing evidence a lack of written description. Is that correct? Well, I think that's a fair statement of the law, Your Honor. But what we have undisputed facts on is that there wasn't any structure, sort of three-dimensional structure known for these enzymes as of 2012. All that was known were amino acid sequences. And we also have no dispute that amino acid sequences are an extremely poor guide to enzyme functionality. Well, that's a testimony that he's cited to us about common structural features. Right, but the common structural features that he's pointed to are two, Your Honor. One of them is this supposed signature amino acid sequence, which is just the super family's sequence that grabs onto the uridine molecule. So that doesn't tell you even what operates on stevial glycosides, let alone what can make RebM. And the other thing is he points to this computer model of a three-dimensional structure of this one enzyme, which first of all was made in 2016, long after the patent application was filed, and which we don't know if it's correct or not. But even if it is correct, they haven't told us what parts of that structure are the ones that account for the functionality. And it's just the one molecule. So again, we don't know. Why doesn't that translate to a genuine dispute of material fact where a jury could say at the end of all that, you've not proven by clear and convincing evidence that it wouldn't do what they're saying it would do, or that a person with a skill in the art wouldn't understand what Dr. Bollinger says they would understand. No, but the argument that's being made, Your Honor, is that every enzyme has to fit its substrate. And it's true enough that enzymes, in order to work, are presumed to fit their substrates. But the argument made at that level of generality, which is all that Dr. Bollinger did, is not enough to identify a common structural feature. Excuse me, the patent office looked at all this as well, including the homology question, did they not? Well, the patent office, I guess, considered in the scope of its prior decision, did address the written description question and focused on... Well, no, that whole discussion of homology modeling was all in the enablement portion of the decision. I think what... I don't believe so, Your Honor. I think that this Court has never found that because homology... ...that the district court could consider in determining whether there was a material dispute of fact on written description. I'm sorry, what was in the record, Your Honor? The PTO's analysis. I suppose the PTO's final decision was submitted to the court in connection with the... Why doesn't that contribute to a genuine dispute of material fact that a reasonable juror, through Dr. Bollinger, might say is relevant to written description? Well, I'm not sure that a reasonable juror would be permitted to consider that, the PTO's final written decision. Not excluded from the record at summary judgment stage yet. Well, but in any event, I think what the district court had to decide was on the evidence before it, whether there was a genuine issue of dispute of material fact, and what the PTAB decided... I think we have cases that say that the PTAB decision is not something that can be presented to the jury. I think that's right. I've certainly never been... I've been in a number of jury cases, and I've never had a judge permit the PTAB decision to be shared with the jury, but be that as it may, I think the real point is that the PTAB made, I think, an erroneous decision based on whatever record was before it. What it did not have before it was the stipulated claim construction in this case. It did not have Dr. Bollinger's testimony that, for example, any enzyme that carries out the function, no matter what the structure is, would fall within the scope of the claims, and you'll find that at appendix 61, 15 to 16, and similar statements by Dr. Bollinger. Where's that last one, 61 what? 61, 15 to 16. He was asked... Yeah. That's your main admission that you point to, that long hypothetical, various assumptions, and at the end of it he says yes. Well, the question is, there's an enzyme that doesn't belong to the structural family that was known as of the filing of the patent, but it still performs the function listed in the court's claim construction, and then the answer is, yeah, if it performs the function regardless of the structure, then it falls within the scope of the claim. He could have said, oh, no, you don't understand. A UDP is a very known thing. If it didn't have the structure that we all know about, then it wouldn't be within the scope of the claim, but that's not what he said. He said anything that carries out the function is going to fall within the scope of the claim. So I think that shows that this is a functional definition, and that is not something that the PTAB had before it. And was that definition one that was mandated by the specification in your view, or I know it was done by stipulation, but... So there is a similar statement in the specification. The court can find it, for example, at Appendix 127 in Column 2, starting at about line 30, and it says the UDP glucosal transferase can be any UDP glucosal transferase capable of adding at least one glucose unit, and then the rest of it is the same. So I think the argument that's being presented here is that, well, the specification talks about UDP glucosal transferases, and when we, Pure Circle, proposed that, we took out the word UDP glucosal transferase and substituted it with a type of enzyme that can. We think that changing what the spec said to what they said actually broadens the class to any kind of enzyme, regardless of structure. But even if the court were not to read it that way, we would still have a functionally defined genus. What about Claim 14? Why is there a lack of adequate written description for that narrower claim? So Claim 14, again, it is not just a single enzyme. We have an admission from Dr. Bollinger, their expert at Appendix 6363, that the UGT76G1 subclass, the members of that class vary considerably in amino acid sequence and properties. And so, again, the record is not super clear on the taxonomy of this super family of UGT enzymes, but if one Googles it, as I did, one will see that they are phylogenetically and then structurally classified. So the numbers in these enzyme names correspond to different classes of plants or animals. So 1 to 50 is animals, and 51 to 70 is yeasts and fungi, and 71 to 100 is plants. And so in plant family 76, whatever that is, which contains a bunch of different plants, somewhere in that family was the first one of these that was found. And so it was named, because it was found in plant family 76, it was called 76, and then there are other categories. So when you talk about 76G1, you're not talking about a single enzyme, you're talking about a family of enzymes that could be found in a bunch of different plants that are variable and have different properties. And so it's just not true that there's a specific answer in that claim. They outlined a gray brief from page 6 atop of page 7, several genuine disputes of material fact that they say should that minimum have concluded summary judgment. If you can give me, I don't want you to go through like six sentences, but I take it your view is going to be none of these are genuine disputes of material fact, and I don't know if there's another general response you would have to that. Well, I think that some of them are not material. I mean, for example, the question whether they did or didn't need the broad genus definition to prove infringement, I don't think really is going to move the needle on invalidity, so that's not a material dispute. But I don't think there is any genuine dispute of material fact about what was known about this class of enzyme structurally at the time. It was absolutely clear that in 2012 the three dimensional structure was not known and that the amino acid sequences were a poor guide to the function of the enzymes. And then the structure function correlation, again, there is no, I think the key fact that was not brought out previously is that everyone agrees, and there's no dispute, that you can't tell either from the homology model picture or from the amino acid sequence whether any given enzyme will work to make RebM. You have to test them all. And so the fact that you have to test each and every one of them to find out whether they do or don't fit within the genus under this court's cases is not enough to satisfy the written description. I'm not sure that's true if you're talking about a limited number that have to be tested. And so perhaps this turns on how many potential candidates there are. And my understanding is that they say that there are common structural features that limit the number of enzymes that would have to be tested. And I'm still, I'm looking again at 6115. What is the question here for an enzyme that doesn't belong to the structural family? What's the structural family? Well, again, this was done in the context of this argument that UDPs have a classification that can be named based on their amino acid sequence. And the argument was being advanced by Dr. Bollinger that when you use the word UDP, you are referring to something that has a structure. And the question was posed, okay, well, if you have something that doesn't have that structure, that doesn't belong in that family of structures that you've been talking about, would that still infringe? And he said, yes, it would. Well, again, we know that you can name enzymes based on their amino acid sequences. So they're named based on how closely they match up with other amino acids that have been previously found. I'm sorry to be so persistent about this, but it's an important question. In the opening argument, we talked a lot about whether there's a common structure here. He identified some testimony from their expert witness that says there are common structural features. And I'm trying to understand whether, first of all, there are common structural features, and if so, what they are. Okay. The record doesn't reflect any structural features common to enzymes that can make RebM. What we have in terms of common structural features is a sequence that has been associated with the super family of enzymes of glycosyltransferases that can take sugar molecules from UDP. So we do have that, but that doesn't answer the question, what can... The answer is that the common structural features that have been identified are common structural features that identify a class of compounds that could be tested and might produce RebM. Yes, Your Honor. To the extent that they've been identified at all, and again, the three-dimensional features that we're talking about have not been identified at all. They say, well, you can look at this thing from 2016, four years after the patent, and you could kind of figure them out, but we don't know what they are. And there hasn't been any correlation between any amino acid sequence or any three-dimensional structure and the effectiveness in catalyzing the reaction. I see that I'm over my time. I would like to spend just a moment on the 101. So I think that the key point here on 101 is that we have only one working example in the specification, and it replicates precisely the process that is carried out in the plant. It starts with a naturally occurring RebD. It uses an enzyme that is structurally and functionally identical to the enzyme found in the plant, and it produces RebM, which is also a naturally occurring compound. And so there isn't any doubt that the claims are directed to a naturally occurring phenomenon, and I think the key point here is that everyone agrees that the claims are broad enough to encompass enzymes that are structurally and functionally identical to the naturally occurring enzymes, which is not surprising because the only example they have of one that works comes from the plant. And that's why we think that it's clear under Alice Step 1 that these are directed to a natural phenomenon, and they haven't even made an argument at Alice Step 2 that purification or percent conversion are anything other than routine and conventional laboratory steps. I recognize you take the view that method of preparation claims are not per se eligible, but is it relevant to the analysis that they contend it's a method of preparation claim? Well, there's certainly no categorical immunity for methods of preparation or manufacture. I think American Axel would be an example of a method of manufacture that ran into a 101 problem. I think the other thing to bear in mind is that if you look at the method of preparation cases that were successful in avoiding 101 problems like Illumina and CellsDirect, the claims themselves had steps in them that were about laboratory methods that were distinct from the natural principle that was being... It was more than a result. It was more than a result, right. It had concrete steps to achieve the result, and that was what distinguished those cases from this one, where here we just have a wish for a 50% conversion or a wish for a particular level of purity, and we don't have anything beyond just put the substrate in with the enzyme and wait until you have enough. Okay, thank you. So just first address would you this question, the common structural features only identify potential candidates for conversion to RebM. They don't identify those that convert to RebM. Correct, Your Honor. There is automated assay testing that both parties' experts agreed was well understood and routine at that time that you would then use to validate, and that's why, Your Honor, the structure function correlation test in Juno is also very instructive here, where the course said it doesn't need to be a perfect correlation, but there's very much a dispute about whether the tools a skilled artisan would have would be adequate here because what the art showed is that you use homology modeling to narrow down what has a common... But the question is how many candidates are... The 1824 is not the correct number because that's only one enzyme, right? Correct, Your Honor. So you say you'd have to at least multiply that by four because of the other enzymes that have been identified as having possibilities, right? Correct, Your Honor. So, but just the next step, so that if there are other enzymes, it would be even more than the 9,000 that would be presented by that calculation, right? No, Your Honor, not that we're known at the time. No, but we've established that this claim covers unknown enzymes, right? Correct. So there's that possibility. Yes, Your Honor, which is always possible in science, and yet that hasn't been a basis on which this court has invalidated claims. And Dr. Bollinger did... Yeah, but has this court said that we don't look at possible additional candidates if the claim is that broad? I'm not aware of a case, Your Honor, that addresses it in those terms, but the four area factors are existing knowledge, extending content of the prior arts. You look at what is known, and then you have maturity of science or technology and predictability of the aspect at issue, which would give you some sense of how much is known and how much might remain to be explored. So that they cover new discoveries as well as unknown enzymes. Correct, Your Honor, but you assess whether written description is met, as a matter of fact, from the perspective of a skilled artisan at the time of filing, and a skilled artisan would have known about the UDP glucosal transferases, disclosed enrichment, discussed in Keyshore, Keyshore use homology modeling, identified specific amino acid substitutions that would work on these enzymes for mutations. And you have testimony from Dr. Bollinger, for example, at page 6119 of the appendix, where following on from the language that my colleague was quoting, what Dr. Bollinger says is that he believes that a type of language is defining UDP glucosal transferase according to what was known at the time of filing. And at the time, it associated everything into a known structural family, and Dr. Bollinger didn't know of any other structures that would fit into that, nor did Sweegen as the party with the burden produce any evidence that would suggest, no, this is actually not mature and not predictable,  that there is a completely different structural family that has an amino acid sequence that looks nothing like Richmond's signature sequence from 2005, looks nothing like the three-dimensional models produced with computer tools available in 2012. There's no evidence like that from Sweegen, and therefore these questions about whether all of those tools, including the assay testing, would be part of what informs how a skilled artisan would view the specification for the adequacy of disclosure, that's all very much disputed. So if we're about out of time, if you have some additional points that you want to make, go ahead. Your Honor, I just wanted to point back again to Claim 14 and the stipulated construction, which is a UGT enzyme encoded by a gene classified in UGT family number 76, subfamily G, and gene number 1 at page 5160 of the appendix, and therefore even beyond all of the other arguments we've been discussing here, that itself is a purely structural definition that meets the original claims doctrine, and then even if you go on to look at the adequacy of written descriptions for mutants under the three tests in Juno, we have these tools we've been discussing. Each party has their own view of whether those tools would inform adequate written description, and that dispute, Your Honors, should be resolved by a jury. Thank you. Okay. Thank you. Thank both counsel. The case is submitted. That concludes our session for this morning.